SILSBY, *Adm'r, v.* SAWYER *& a.*

A will containing this clause, "The rest and residue of my property I wish to have sold, and the avails divided between my brother J. B. S.'s family and M. J. M."—*Held*, to give one half the residuum to the children of J. B. S., and one half to M. J. M.

BILL IN EQUITY, for the construction of the following clause in the will of Lydia P. Wilcox, late of Newport: "The rest and residue of my property after paying all debts, and erecting a suitable headstone at my grave, I wish to have sold, and the avails divided between my brother John B. Sawyer's family and Mary J. Miller." The will contained the following among other bequests: "I give to my brother John B. Sawyer, of Broadhead, Wisconsin, the sum of fifty dollars for the use of his family;" "to the family of my brother B. F. Sawyer, deceased, the sum of one dollar."

John B. Sawyer is now living, and the defendants, Laura E. Langdon, Carrie, Kittie, Charles M., Nettie, and Henriette, are his children. Frank, his only other child, died March 22, 1887, never having married. John B. has no wife or grandchild now living, and no other family than his children, nor had he any other family at the execution of the will or at the death of the testatrix. The other residuary legatee is a niece of the testatrix. There is in the hands of the plaintiff the sum of $651.51, to be distributed according to the residuary clause.

John B. claims that he is entitled to have the share of the residuum bequeathed to John B. Sawyer's family paid over solely and exclusively to him; his children claim to have the same distributed among themselves to the exclusion of their father; while John B. and his said children claim that in the distribution Mary J. Miller is to receive a share equal only with each member of John B.'s family; and Mary J. claims that the residuum must be divided into two equal parts, one share to be paid over to her, and the other share only distributed among the other defendants. The administrator prays the advice of the court.

*S. L. Bowers,* for the children of John B. Sawyer. I. Does John B. Sawyer take anything by the residuary clause of the will? In a prior clause $50 is given to him "for the use of his family." That sum was made payable to him for a certain purpose, but in the clause now under discussion a part of the residue is given "to my brother John B. Sawyer's family." The word "brother" was clearly used to designate the family intended. If the words had been "to my brother's, to wit, John B. Sawyer's family," it would not have expressed more exactly the meaning of the testatrix. A bequest to one's family generally excludes the father, and may exclude both parents. *Barnes* v. *Patch,* 8 Ves. 604; *Mac Leroth* v.

*Bacon*, 5 Ves. 159; *Blackwell* v. *Bull*, 1 Keen 176; *James* v. *Lord Wynford*, 2 Sm. & G. 350; 2 Redf. Wills 73, *s.* 5; 2 Jarm. Wills 23. Parents are not included unless the will so states. *Ib.* Worcester defines "family" to be those who are of the same lineage, or who descend from the same ancestor.

The word "family" is here used in a restricted sense—not in the broader sense so as to embrace parents, children, grandchildren, house, clan, or race. *Barnes* v. *Patch*, 8 Ves. 604, 607; 2 P. Wms. 818, 819; *Blackwell* v. *Bull*, 1 Keen 176; *Woods* v. *Woods*, 1 Myl. & C. 401; *Grant* v. *Lyman*, 4 Rus. 292; *Doe* v. *Fleming*, 2 C M. & R. 638; 2 Sto. Eq., *ss.* 1065 *b*, 1071. Every time the testatrix refers to this brother in her will she is careful to use words that show that the bequests are "for the use of his family," or "to his family," but not to him. The fair interpretation of the will excludes him. It was his family, *i. e.*, his children, that the testatrix had in mind as the object of her bounty. 1 Roper Leg. 136, *s.* 18.

II. Does Mary J. Miller take one half of the residue? We submit that she does not. The residuum is to be divided between "my brother John B. Sawyer's family and Mary J. Miller." Does she take as much as all the children, or is her share to be equal to any one of them and no more? In other words, is the residue to be divided into two parts, Mary J. to receive one part and the family the other, or is the balance of the estate to be divided into eight parts, and Mary J. to receive one eighth and the children the other seven eighths?

The children of John B. Sawyer and Mary J. Miller are related to the testatrix in the same degree, to wit, nephews and nieces. Do they take the residuum *per capita*, or *per stirpes?* If the testatrix had said "the avails to be divided between Carrie, Kitty, Charles M., Nettie, Laura E., Langdon, Henriette, and Mary J. Miller, would the meaning of her bequest have been changed at all? We think not, and that each of the individuals composing the family of John B. Sawyer would have taken an equal share with Mary J. Miller, *i. e.*, each one eighth of the residue. They take *per capita*. *Farmer* v. *Kimball*, 46 N. H. 435, is directly in point and decisive of this case;—see, also, 2 Jarm. Wills 111 *n.*; *Blackler* v. *Webb*, 2 P. Wms. 385; *Lincoln* v. *Pelham*, 10 Ves. 176; *Longmore* v. *Broom*, 7 Ves. 125; *Barnes* v. *Patch*, 8 Ves. 604; *Davenport* v. *Hanbury*, 3 Ves. 259; *Lugar* v. *Harman*, 1 Cox 250; *Smith* v. *Streatfield*, 1 Mer. 358; *Weld* v. *Bradbury*, 2 Vern. 705; *Brown* v. *Ramsey*, 7 Gill 347; *Smith* v. *Ashurst*, 34 Ala. 208; *Nichols* v. *Denny*, 37 Miss. 59; 1 Roper Leg. 156, *ss.* 16, 22, 23; Car. 2, *c.* 10; *Walsh* v. *Walsh*, Prec. Ch. 54; *Bowers* v. *Littlewood*, 1 P. Wms. 595; *Durant* v. *Prestwood*, 1 Atk. 454; *Lloyd* v. *Tench*, 2 Ves. 213; Mascales Int. 73, in which a variety of cases are collected. The construction would be the same if the legatees were described by the word "family." *Barnes* v. *Patch*, 8 Ves. 604; *Davenport* v. *Hanbury*, 3 Ves. 259.

There is nothing in the will that negatives this view of the bequest. Mary J. Miller is nowhere named in the will as representing any family or any relationship to the testatrix. She is named once before in the will as of Napa, California, and a bequest to her of " my black lace shawl." For all that appears in the will she may have been a stranger to the testatrix. The bequest to her, whatever it is, is given without any statement as to her relationship or the amount of the bequest, while at the same time the testatrix does designate " her brother John B. Sawyer's family." It may be, and probably was, the fact that the testator did not know the names of the children of her brother, John B. Sawyer, and therefore she grouped them all in one word, " family," evidently meaning that each individual composing that family, and Mary J. Miller, should share in the residuum equally, or, in other words, *per capita*. There is nothing in the bequest or will that indicates that Mary J. Miller takes as a class or *per stirpes*, or in any way except as one individual with all the individuals composing the family of John B. Sawyer. The construction is not controlled by the word " between;" it may mean the same as " equally among." *Regina* v. *Newman*, 17 L. & Eq. 126. Neither is it necessary that the devisees should be each named individually : the term " family " covers the same ground. *Roper* v. *Roper*, 5 Jones Eq. 17 ; *Weld* v. *Bradbury*, 2 Vern. 705 ; *Bowers* v. *Porter*, 4 Pick. 210. Any inference of an intention to divide the residuum by classes is merely conjectural, and quite too uncertain to prevent the application of the well settled rule that the division should be *per capita* in equal shares between Mary J. Miller and each of the children of John B. Sawyer. *Lincoln* v. *Pelham*, 10 Ves. 176 ; *Kean* v. *Roe*, 2 Harr. (Del.) 120.

*A. S. Wait*, for Mary J. Miller. The question touching the interest of Mary J. Miller is, whether by a true construction of this will she is to take one half the residuum, the other half to go to the family of John B. Sawyer, or whether the distribution is to be made *per capita*, she taking a share equal only with each member of that family. Of course the question is purely as to the intention of the testatrix, to be ascertained, as in other cases, upon all competent evidence bearing upon it. What did she mean by the language she used ?

Whether the testatrix had or had not any knowledge of our statute of distributions, or of the laws of descent, it is clear from the whole context of this will that she had in mind, all the time, the idea of representation ; that it was that which governed in its whole structure. She had in mind the different branches of her collateral kindred as so many stocks, of which her brothers were the heads. Hence her bequests, where not to single individuals, are all by families. In one she gives to the " family " of her brother, B. F. Sawyer, deceased, the nominal sum of one dollar ; in another fifty

dollars to her brother John B. Sawyer "for the use of his family."
Then in the residuary clause she directs the residuum to be
"divided between " her brother " John B. Sawyer's family" and
Mary J. Miller. The " family " of B. F. Sawyer is one unit or
stock, that of John B. Sawyer another, and Mary J. Miller is
made the representative of a third.

If the testatrix had in mind this idea of stocks, and a purpose to
divide her estate between two of these as such, excluding a third,
she could hardly have chosen language more appropriate for the
accomplishment of that intention. The language is obviously not
appropriate to the other supposed intent. This evidence of inten-
tion is reënforced and greatly strengthened by the preposition
used to connect the two objects of the testatrix's bounty. She
directs the residuum to be divided "between " John B. Sawyer's
family and Mary J. Miller, not among them, as would have been
the appropriate word if a *per capita* distribution was intended.
She excludes one "family," that of B. F. Sawyer, as a class, from
her bounty, then selects another " family " as a class, and Mrs.
Miller, whom she makes the representative of a third family, and
" between " the two last makes an equal division of her estate.
She uses no language indicative of an intention to make an indi-
vidual distribution, and none appropriate to such a purpose, but it
is all appropriate to the opposite intention.

It is doubtless quite true, as held in *Farmer* v. *Kimball*, 46 N. H.
435, that the use of the preposition " between " instead of " among,"
cannot in such cases control the construction against an opposite
apparent intent ; but it is nevertheless true that the choice of the
word in this case is evidence tending to show what was truly the
purpose of the author of the language. The argument of the dis-
tinguished counsel for the petitioners in that case, upon the effect
of the choice of this word instead of " among," is applicable to the
present case in all its force, and it failed there only because the
case was such as to render it inapplicable in the very particular
in which that case differed from this. It is true, also, that in
*Farmer* v. *Kimball* the construction was such that the legatees
took *per capita* and not *per stirpes*, and there is, doubtless, a great
weight of authority in support of the doctrine there held. While
citing and accepting those authorities, Mr. Jarman says,—" But
this mode of construction will yield to a very faint glimpse of a
different intention in the context." 2 Jarm. Wills 757.

I may, perhaps, be indulged in the suggestion that this term
" family," so often and with such special significance, as seems
to me, used by the testatrix in this will, is of very archaic origin,
and had a fixed and precise meaning in quite primitive times. The
family was the unit of society, and bore that relation to the state.
It was essentially a corporation, and alone could hold property ;
the individual had no recognized existence other than as a constit-
uent part of the family ; for his acts, not himself but his family

was responsible; it held the property and answered for the acts and conduct of the individual members. Maine's Ancient Law 128, 178–180, 250–252; The Ancient City, De Coulanges, 61, 86, 90, 119, 121.

" But ancient law  . . .  knows next to nothing of individuals. It is concerned not with individuals but with families, not with single human beings but groups." Maine Anc. L. 250. With slight changes in its relation to the state, this corporate existence of the family is plainly visible in the politics of the Grecian states. 3 Grote's Hist. Greece 54–58. It was a prominent feature of that of Rome throughout the existence of that power. Dig. 50, *tit.* 16, *ss.* 105, 196; 2 Ayliffe's Pand., *tit.* 4; Adam's Rom. Antiq. 28, 29; 1 Mommsen's Hist. Rome 88–94.

The institution, in nearly all its political importance, maintained its existence in some countries until quite modern times, as in the clans of Ireland and the Scottish highlands; it even still exists in its clearly defined character, though perhaps with modified and varying political relations, in the village communities of India, and in similar institutions in Russia and the countries of eastern Europe. Maine Anc. L. 252–261.

The great changes which have brought about the new civilization of southern and western Europe have, indeed, as the unit of society, replaced the family by the individual; nevertheless, the idea of the family, as a distinct entity, is as fresh to-day, and the word in the general mind imports as clearly defined a meaning, as in the primitive ages of the world. In spite of the disintegration of ancient institutions in general, this one still remains. It is in truth founded in human nature, and men speak to-day of the " family " as expressive of that peculiar unity which is understood from the use of no other word. The word is used in the same sense by all classes of people, by the learned and the ignorant, by the cultured and the clown, in poetry and in prose, in literature and in law.

It was in this universally understood sense that this lady, Lydia P. Wilcox, used the word in describing in her will the intended objects of her bounty. The line of distinction between the language of this will and that in *Farmer* v. *Kimball*, with all the cases upon which that decision rests, is clear and marked. In that case the language is,—" I give and devise unto my cousins and to the children of my mother's cousins," etc.; here it is, " I wish . . the avails divided between my brother John B. Sawyer's family and Mary J. Miller." The language in *Farmer* v. *Kimball* may very well be understood as referring to the several cousins as individuals; certainly the word imports no necessary idea of class unity, nor is there any recognized usage giving to them that meaning. But in this case the term " family " admits of no other idea than that of unity as a stock, and there is no language anywhere to be found in this will which tends in the least to show an in-

tended use of it in any other sense.  I submit, therefore, that on the doctrine of interpretation emphasized by the cases of *Rice* v. *Society*, 56 N. H. 191, *Brown* v. *Bartlett*, 58 N. H. 511, *Morse* v. *Morse*, 58 N. H. 391, *Houghton* v. *Pattee*, 58 N. H. 326, and other late decisions by this court, Mary J. Miller is entitled to one half of this residuum.

*G. R. Brown*, for John B. Sawyer.

DOE, C. J.  Among the legacies are one to the testatrix's brother Uriah, one to her brother John B. "for the use of his family," one to the widow of her brother Joseph, one to the widow of her brother Langdon, one "to the family" of her deceased brother B. F., and one to Mary J. Miller, who is a daughter of Joseph.  The residue is to be sold, and the avails are to be "divided between my brother John B. Sawyer's family and Mary J. Miller."  The wife of John B. died before the execution of the will.  The testatrix's intention, proved by competent evidence, is her will, and is not defeated by rules of construction.  The questions presented by the parties are, whether Mary J. Miller takes half of the residue, and whether John B. takes any part of it as one of his family.  On these points the competent evidence leaves the testatrix's meaning in doubt; but the whole will, taken together, shows a balance of probability in favor of her intention to give one half of the residue to Mary J. Miller, and the other half to the children of John B.

*Case discharged.*

ALLEN, BLODGETT, and CARPENTER, JJ., concurred; SMITH and BINGHAM, JJ., dissented on the question of the testatrix's intention to give one half of the residue to Mary J. Miller and the other half to the children of John B. Sawyer, instead of dividing it *per capita ;* CLARK, J., did not sit.